CLAIBORNE AND HUGHES
CONVALESCENT CENTER,
INC., Petitioner/Appellee,

v.

STATE of Tennessee, DEPARTMENT OF
HEALTH, Respondent/Appellant.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

April 8, 1994.

Application for Permission to Appeal
Denied by Supreme Court
July 25, 1994.

Charles W. Burson, Atty. Gen. and Reporter, Sue A. Sheldon, Asst. Atty. Gen., Nashville, for appellant.

Gail Vaughn Ashworth, Gideon & Wiseman, Nashville, for appellee.

## OPINION

TODD, Presiding Judge.

The State of Tennessee, Department of Health ("the Department") has appealed from a judgment of the Trial Court reversing an administrative decision imposing a civil penalty of $1,000 upon Claiborne and Hughes Convalescent Center, Inc. ("the Center") for violation of T.C.A. § 68–11–811(b), and Section 1200–8–6–.4–(2)(f)(I)(VI) of the Regulations of the Department relating to deficient nursing homes.

### –Issues on Appeal–

The appellant, State of Tennessee, Department of Health, presents the following issues:

1. Whether the Trial Court erred in construing T.C.A. § 68–11–803(b)(1) to require that the State must demonstrate "willful neglect" of nursing home residents before the State may assess type B civil monetary penalties upon a nursing home.

2. Whether the administrative record contains substantial and material evidence

of the petitioner nursing home's "neglect" of patient "S" in this case.

3. Whether, assuming *arguendo,* that T.C.A. § 68–11–803(b)(1) must be construed to require a showing of "willful neglect," the Trial Court erred in holding that there was no substantial and material evidence of "willful neglect" of patient "S."

*–The Law and Regulation–*

Title 68 of Tennessee Code Annotated is devoted to the subject of "Health."

Chapter 11 of Title 68 is entitled, "Health Facilities and Resources."

Part 1 of Chapter 11 provides for issuance of "Certificates of Need" for health facilities.

Part 2 of Chapter 11 is entitled, "Regulation of Health and Related Facilities."

T.C.A. § 68–11–201(15)(A) and (B) provides:

"Nursing home" means any institution, place, building or agency represented and held out to the general public for the express or implied purpose of providing care for one (1) or more nonrelated persons who are not acutely ill, but who do require skilled nursing care and related medical services.

"Nursing home" shall be restricted to facilities providing skilled nursing care and related medical services to individuals, beyond the basic provision of food, shelter and laundry, admitted because of illness, disease or physical infirmity for a period of not less than twenty-four (24) hours per day;

Part 8 of Chapter 11 is entitled "Deficient Nursing Homes."

T.C.A. § 68–11–801 provides:

**Authority to impose penalties.**—(a) The commissioner of health has the authority to impose civil monetary penalties upon deficient nursing homes, as defined by § 68–11–201, under the circumstances as provided in this part.

(b) In addition to the civil monetary penalties specifically enumerated in this part, the commissioner has the authority to impose civil monetary penalties in such amount, scope, manner and circumstances as required by the Federal Nursing Home Reform Act of 1987.

(c) The commissioner has the authority to promulgate rules and regulations to impose the civil monetary penalties described in subsection (b). [Acts 1987, ch. 312, § 1; 1989, ch. 512, §§ 1, 6.]

T.C.A. § 68–11–803 provides in pertinent part:

**Type B civil monetary penalties—Violation of enumerated patients' rights and nursing home standards.**—(a) Type B violations directly impact the care of the patients in the nursing home and are of such clarity and specificity as to provide ample notice to all nursing homes and to the public of the acts prohibited and the conduct required.

(b) A type B civil monetary penalty may be imposed whenever any of the following standards are violated and such violation need neither be repeated, nor found in multiple cases, before the penalty is assessed: (1) Residents must not be willfully abused or neglected, as these terms are defined by § 71–6–102; ...

T.C.A. § 71–6–102 reads in pertinent part as follows:

**Definitions.**—As used in this part unless the context otherwise requires:

(1) "Abuse or neglect" means the infliction of physical pain, injury or mental anguish, or the deprivation of services of a caretaker which are necessary to maintain the health and welfare of an adult, or a situation in which an adult, living alone, is unable to provide or obtain for himself the services which are necessary to maintain his health or welfare. Nothing in this part shall be construed to mean a person is abused or neglected or in need of protective services for the sole reason he relies on or is being furnished treatment by spiritual means through prayer alone in accordance with a recognized religious method of healing in lieu of medical treatment; further, nothing in this part shall be construed to require or authorize the provision of medical care to any terminally ill person if such person has executed an unrevoked living will in accordance with

the provisions of the Tennessee Right to Natural Death Law, compiled in title 32, chapter 11, and if the provisions of such medical care would conflict with the terms of such living will.

.     .     .     .     .

Section 1200–8–6–.4(2)(f)(I)(VI) of the Regulations of the Department reads as follows:

Body position of bed patients and chair bound patients shall be changed at least every two hours (days and nights) while maintaining good body alignment. Bony prominences and weight bearing parts shall be bathed, dried and thoroughly massaged to prevent discomfort and the development of pressure areas unless contraindicated by physician's orders.

## –The Facts–

The center is a duly licensed intermediate and skilled care nursing home. The subject of this appeal is its care of an anonymous patient in respect to a severe condition of her left heel.

The patient was a seriously ill seventy-nine year old female with a myriad of medical problems, including end stage renal disease, severe diabetes, pulmonary edema, congestive heart disease, anemia, glaucoma, peripheral vascular disease and blindness. Since August, 1990, she had been attended by Dr. Kenneth George who saw her at the center at least once a week. She was also seen periodically by her internist, Dr. Richard Garman, who first saw her at the St. Thomas Hospital Emergency Room in 1989 or 1990 for congestive heart failure, diabetes and renal failure. He treated her in subsequent hospitalizations in January, 1990, April and May, 1990, June, 1990, July, 1990, November and December, 1990, and February, 1991.

The condition of the patient's foot was related to her peripheral nerve disease, diabetes melitis, renal failure and heart failure.

Both Dr. Dodge and Dr. Garman had been aware of a decubitus ulcer on the patient's left heel since November or December, 1990. The condition would not improve without surgery which was not advisable because of her other serious problems.

On May 27, 1991, Dr. Garman saw the patient at the REN Dialysis Center. He examined her left foot, finding extensive infection, a foul smelling wound with drainage, and a lot of dead necrotic tissue. He debrided as much dead tissue as he could and planned to admit the patient to the hospital on June 29, 1991, for probable amputation of her lower left limb.

On May 27, 1991, Dr. Garman ordered application of travase ointment (a debriding agent), twice a day, and keftabs (an antibiotic), by mouth, twice a day.

On May 28, 1991, the center reported to Dr. Garman that travase was unavailable because of a holiday. Dr. Garman testified without contradiction that the lack of the medication would not affect the outcome of the foot problem.

The dressing on the left heel was changed on May 28, 1991, at which time the wound was dry and free of maggots. The travase ointment was not obtained or applied prior to the transportation of the patient to the REN Center for dialysis, on the following day, May 29, 1991. Dr. Garman saw her at the REN Center, finding the foot condition worse, and blood sugar very high; and he advised amputation which was performed by a surgeon on May 30, 1991.

Dr. Garman saw no maggots on the heel on May 29, 1991, but was told by REN attendants that they were present when the dressing was removed at REN on May 29. He was not surprised because frequently when dead, necrotic tissue is present, maggots show up. The presence of the maggots did not jeopardize the patient's condition; the foot was already irretrievable. The maggots caused the patient no pain, and could have come from anywhere in the patient's environment, (i.e. the center, the transportation to and from the REN Center on May 27, 1991, or the REN Center on May 27, 1991.)

The absence of travase ointment had no effect upon the wound because of the extensive debridement performed on May 27, 1991, and the presence of the ointment would not have prevented the appearance of the maggots on May 29, 1991.

Dr. Garman testified without contradiction that he found no evidence of abuse or neglect of the patient; that the care given to the patient was acceptable care, and that the ulcer and its complications and the ultimate amputation could not have been prevented by any available therapy.

Dr. Dodge testified that he would not have done anything differently in retrospect other than perhaps documenting the treatment better.

The attendants at the REN Center reported to the State Department of Health the presence of maggots in the necrotic tissue on the patient's left heel, resulting in the present procedure.

*–Administrative Proceedings–*

On June 12, 1991, "the Commissioner" (not otherwise identified), signed a 14 page document under the following caption and introduction:

BEFORE THE TENNESSEE PANEL
ON HEALTH CARE FACILITY
PENALTIES
IN THE MATTER OF:
CLAIBORNE & HUGHES CONVALES-
CENT CENTER,
200 STRAHL AVENUE
FRANKLIN, TENNESSEE 37064
BY ORDER OF THE COMMISSIONER
OGC CASE NO. 91–0492
LICENSE NO. 8593

*ASSESSMENT OF CIVIL PENALTY*

On May 29 and 30th, 1991, the Tennessee Department of Health (the "Department") conducted a complaint investigation at the above cited facility as granted under T.C.A. 68–11–210(b)(3).

Based upon the findings of that complaint investigation, upon the laws of this State, and the regulations promulgated by the Board of Licensing Health Care Facilities, the Commissioner of the Department now concludes that this facility has violated both Board Regulation 1200–8–6–.04(2)(f)(i)(vi) and Tennessee Code Annotated 68–11–803(b)(1)....

Despite the caption reference to the Tennessee Panel on Health Care Facility Penalties, ("Panel"), it is obvious that the initial assessment of penalty was by the Commissioner of the Department of Health under the authority of T.C.A. § 68–11–801 without any participation of the Panel.

The Assessment concludes:

Pursuant to Tennessee Code Annotated § 68–11–803(b)(1), a civil monetary penalty in the amount of $1000.00 (one thousand dollars) is now assessed.

In determining the amount of this assessment, the Commissioner has among other factors, considered the degree of sanctions necessary to insure immediate and continued compliance, procedures necessary or appropriate to comply or correct the violation, and the facility's prior violations. (Tennessee Code Annotated 68–11–207(c)).

The facility's attention is directed to the attached statement of its rights in this matter. Should the facility appeal this assessment to the Panel on Health Care Facility Penalties, such request should be done as directed by the attached Notice of Rights.

Issued and placed in the United States mail, return receipt requested, on this the 12th day of June, 1991.

/s/H. Russell White, Commissioner

On June 14, 1991, the Center wrote to the Director of the Division of Health Care Facilities of the Department contesting the decision and requesting a hearing. A copy of the letter was sent to the Administrative Procedures Division of the Office of the Secretary of State.

On July 8, 1991, the Center was notified that the Panel "would meet on September 24, 1991, to hear the charges against the Center in a "contested case."

There is no indication in the record that the Panel ever met or heard the matter, or that it ever requested or authorized an administrative judge to hear or decide the case, or that it ever reviewed or approved his decision.

The record contains transcripts of hearings before the administrative judge on September 24, 1991, and December 13, 1991. On April 22, the administrative judge filed an "initial order" containing the following findings:

1. The records of the center reflect physician's notes on November 8, 1990, December 6, 1990, January 10, 1991, February 7, 1991, April 4, 1991, May 2, 1991, May 23, 1991, and May 27, 1991. On the latter date, a surgeon debrided decubitus on the left heel.

2. Said records should have alerted the nursing staff to the need for accurate and detailed evaluations to be noted on the record.

3. The quarterly review of April 30, 1991, failed to include the decubitus or the need for special care for the patient's skin.

4. There was no record that the antibiotic prescribed by the physician was administered on May 28 and May 29 in the mornings.

5. Nurses failed to request more aggressive treatment.

6. Records failed to show that "podisplints" were checked every shift.

7. Nurses' progress notes were not sufficiently specific.

8. The maggots were the result of the odor which attracted flies, which laid eggs, which hatched in the form of maggots; or larvae.

The administrative judge concluded:

1. The State has carried its burden of proof by a preponderance of the evidence that the respondent's conduct in this matter was in violation of T.C.A. § 68–11–803(b)(I), as well as Board Regulation 1200–8–6–.04(2)(f)(I)(VI).

2. The proof establishes a clear pattern on the part of the respondent of a lack of nursing care, lack of skin care, failure of the part of the staff to document adequately and accurately treatments given and an ongoing failure of the staff to follow the treating physician's orders causing a deterioration in the patient's condition in clear violation of the above-referenced code section and Board rule.

. . . .

4. Accordingly, it is ORDERED that pursuant to the provisions of T.C.A. § 68–11–811(b), a $1,000.00 civil penalty is assessed against the respondent.

Some insight into the origin of the decision of the administrative judge is derived from the following exchange during the administrative hearing:

Q. (By Judge McGowan) Ms. Pewitt, you were telling me you all did a good job and did what the doctor told you to do?

A. Yes.

Q. How in the world, if you did, did she wind up out at that dialysis clinic with *that terrible thing* on her heel? (emphasis added).

(Tr., Vol. I, p. 109).

. . . . .

Q. (By Judge McGowan) Obviously, she picked them up somewhere. If you all were taking proper care of this lady, how come she showed up out there with maggots *in this thing?* (emphasis added)

(Tr., Vol. I, p. 110).

On April 22, 1992, the administrative judge filed a ten page order assessing a $1,000 penalty. The order was accompanied by a notice which stated:

This order is an initial order rendered by an administrative judge with the administrative procedures division.

The initial order is not a final order but shall become a final order unless:

1. A party files a written appeal or petition for reconsideration with the administrative procedures division no later than May 4, 1992.

OR

2. The agency files a written notice of review with the administrative procedures division no later than May 4, 1992. You must file the appeal, petition for reconsideration or notice of review with the *administrative procedures division.*

The address of the administrative procedures division is:

Secretary of State
Administrative Procedures Division

Suite 1700, James K. Polk Building
Nashville, TN 37243–0307

On May 1, 1992, the center filed a five page "Petition for Reconsideration of Initial Order."

The Director of Administrative Procedures Division of the Secretary of State signed an undated, "Notice of Denial of the Petition for Reconsideration of the Initial Order" stating:

The Petition for Reconsideration filed on May 1, 1992, is denied effective May 21, 1992.

(x) There having been no action taken by the Administrative Judge on the petition within twenty (20) days as provided by § 4–5–317.

( ) By Order of the Administrative Judge.

/s/Charles C. Sullivan II,

Director Administrative

Procedures Division

The Initial Order shall become a Final Order unless:

1. A party files a written appeal with the Administrative Procedures Division no later than June 1, 1992.

2. The Agency files a written notice of review with the Administrative Procedures Division no later than June 1, 1992.

You must file the appeal with the Administrative Procedures Division and the address is:

Secretary of State

Administrative Procedures Division

17th Floor, James K. Polk Building

Nashville, TN 37243–0307

If you have any questions, please call the above Division at: 615–741–7008 or 741–2078.

The same director signed an undated "Notice of Initial Order Becoming a Final Order."

On June 2, 1992, the center filed a "Petition for Appeal From Initial Order and Order Denying Petition for Reconsideration Thereof."

On the same date, the administrative judge notified counsel for the center by letter that the petition was untimely and "the matter is now out of our hands."

*–Proceedings in the Trial Court–*

On July 30, 1992, the center filed its petition for review reciting the above administrative proceedings and stating:

... 8. The petition for appeal from initial order and order denying petition for reconsideration thereof was timely filed and should have been granted with a contested case hearing set before the Tennessee Panel on Health Care Facility Penalties for review of the initial order.

. . . .

11. The administrative findings, inferences, conclusions and decision are in violation of constitutional and statutory provisions including T.C.A. §§ 68–11–803(a), 68–11–803(b)(1), 68–11–811(b), 68–11–814, 71–6–102, and Board Regulation 1200–8–6–.04(2)(f)(I)(VI).

12. The administrative findings, inferences, conclusions and decision are in excess of the statutory authority of the agency.

13. The administrative findings, inferences, conclusions and decision were made upon unlawful procedure.

14. The administrative findings, inferences, conclusions and decision are arbitrary and capricious and characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

15. The administrative findings, inferences, conclusions and decision are unsupported by evidence which is both substantial and material in the light of the entire record.

. . . .

Wherefore, petitioner respectfully petitions this Court for review of a final order by an administrative agency and requests the remedy of a remand for further proceedings pursuant to the previously-filed petition for appeal from initial order and order denying petition for reconsideration thereof filed June 1, 1992, and/or for the remedy of reversal of modification of agency action including reversal or modification of the findings of fact, inferences, conclusions of law and decision upholding the Assessment of Civil Monetary Penalty....

On May 14, 1993, the Trial Judge filed a comprehensive memorandum concluding that:

[T]he Department's decision is not based upon substantial and material evidence in light of the entire record.

Judgment of reversal was entered. It does not appear that the complaint as to the administrative procedure was addressed by the Trial Court.

■ On appeal to this Court, appellant's first issue presents the question of whether the word, "willfully" modifies only the word, "abused" or both "abused" and "neglected" as found in T.C.A. § 68–11–803, quoted above.

Willful has been defined as: "Proceeding from a conscious motion of the will; intending the result which actually comes to pass; intentional; not accidental or involuntary." It has also been held to be a word of many meanings depending upon the context in which it is used. *Black's Law Dictionary,* Fourth Edition, p. 1773.

"The context in which used" includes other provisions of the applicable statutes. T.C.A. § 68–11–803 defines a Class B violation as those which "directly impact the care of patients in nursing homes and are of such clarity and specificity as to provide ample notice to all nursing homes and to the public of the acts prohibited and the conduct required."

Other than the references in the administrative orders to Regulation No. 1200–8–6–.04(2)(f)(i)(VI), quoted above, there is no citation of any published regulation which would provide nursing homes with notice that any particular act or omission would subject them to a Class B penalty. Absent such actual notice, the statute implies notice that nursing homes would be subject to penalty for any act or omission which directly (and adversely) impacts the care of a patient in a nursing home.

Moreover, "abuse or neglect" is defined in T.C.A. § 71–6–102 as the infliction of physical pain, injury or mental anguish or deprivation of services which are necessary to maintain the health and welfare of an adult.

This Court concludes that, in T.C.A. § 68–11–803, the word, "willfully" refers to both "abused" and "neglected," but with meaning appropriate to each word. The word, "abuse," implies an overt active deed. A deed is presumed to be intentional unless shown to be inadvertent or accidental; and the result of the deed is presumed to be intentional unless shown otherwise.

On the other hand, neglect is the failure to perform a deed, and neither the omission nor its result is presumed to be intentional unless intent is shown or the circumstances are such as to imply intent.

■ In relation to the alleged negligence of the employees of the center, no evidence is found of neglect which was actually willful or should be considered willful under the circumstances. Nor is there evidence that the negligence of the employees of the center was such as to directly impact the care of the patient or was of such clarity and specificity that all nursing homes and the public were on ample notice that it would result in a penalty.

The Department, the administrative judge, and the appellant stress an alleged laxity in record keeping. No regulation is cited and no circumstance is shown to evidence negligence in record keeping which directly impacted the care of the subject patient, or which were of such obvious seriousness that all nursing homes and the public would have notice that such negligence would invoke a Class B penalty.

The reaction of the REN center staff, the commissioner and the administrative judge to the presence of maggots was natural and understandable, but it was not shared by the physician who testified that he was not surprised.

It is common knowledge that dead, rotting flesh attracts flies which lay eggs on the rotting flesh so that the larvae produced by the eggs may feed on the rotten flesh.

It is a matter of history that, before the development of the modern art of surgical debridement, physicians used maggots to remove rotten flesh from wounds.

From an objective view, the presence of the maggots was neither shocking nor repulsive.

The physicians indicated that the presence of the rotting flesh and maggots was not preventable. Their presence alone did not evidence a Class B violation.

If the center had changed the dressing on May 29, 1991, before sending the patient to REN Center, the maggots might well have been discovered and reported to the physician for instructions before the patient was sent to the REN Center. However, the failure to do so did not directly and adversely impact the care of the patient or otherwise represent a Class B violation.

This Court agrees with the finding of the Trial Court that the administrative decision is not supported by substantial and material evidence. The judgment of the Trial Court is therefore affirmed. Costs of this appeal are taxed against the appellant. The cause is remanded to the Trial Court for further, appropriate proceedings.

Affirmed and Remanded.

LEWIS and CANTRELL, JJ., concur.